IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
Assigned on Briefs March 13, 2024

## STATE OF TENNESSEE v. LANDON ALLEN TURNER

**Appeal from the Circuit Court for Marion County**
No. 10904     Thomas W. Graham, Judge
_____

**No. M2023-01254-CCA-R3-CD**
_____

A Marion County jury convicted Landon Allen Turner, Defendant, of reckless homicide and aggravated child abuse for the death of Z.H.,[1] Defendant's girlfriend's two-year-old son. He argues on appeal that: (1) the juvenile court erred in transferring his case to circuit court; (2) the State violated its *Brady* obligations by failing to provide defense counsel with a copy of Defendant's statements prior to the juvenile transfer hearing; (3) the evidence was insufficient to support his convictions; (4) his conviction for aggravated child abuse should be barred under the doctrine of "mutually exclusive verdicts"; and (5) his sentence is excessive. After review, we affirm the judgments.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed**

TIMOTHY L. EASTER, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., J., and CAMILLE R. MCMULLEN, P.J., joined.

M. Keith Davis (on appeal and at trial), Dunlap, Tennessee; Ted Engel, District Public Defender; and Norman Lipton (at juvenile transfer hearing), Assistant Public Defender, Jasper, Tennessee, for the appellant, Landon Allen Turner.

Jonathan Skrmetti, Attorney General and Reporter; Benjamin A. Ball, Senior Assistant Attorney General; Courtney Lynch, District Attorney General; and Steven H. Strain and Sherry D. Shelton (at trial), and Julia Veal (at juvenile transfer hearing), Assistant District Attorneys General, for the appellee, State of Tennessee.

## OPINION

_____

[1] It is the policy of this Court to protect the identities of minor victims by using their initials.

Defendant was initially charged in 2018 in the Marion County Juvenile Court with first degree felony murder and aggravated child abuse. The juvenile court transferred Defendant's case to circuit court after a juvenile transfer hearing. The Marion County Grand Jury indicted Defendant for one count of first degree felony murder and one count of aggravated child abuse. Trial took place over four days in April 2022.

Trial

*Z.H.'s Death*

The proof at trial established that Z.H. was born in August 2014 to E.R. ("Mother") and E.H. ("Father"). Mother and Father later ended their romantic relationship but continued to co-parent Z.H. Mother took care of Z.H. on days Father worked, and Father took care of Z.H. on days Mother worked. Z.H. spent most of his time with Father. Father accused Mother of partying too much and abdicating her responsibilities to Z.H. Father testified at trial that Z.H. would sometimes stay with him for weeks at a time. Sometimes, Mother would bring Z.H. back to Father after only a few hours.

In August 2016, Mother was in a romantic relationship with Defendant. Defendant lived with Mother in her apartment in South Pittsburg, Tennessee. Defendant was 17 years old, and Mother was 20. Defendant and Father did not get along.

Mother left her apartment around 5:30 a.m. on Wednesday, August 17, 2016, for her job at Taco Bell in Kimball. She left Z.H. in Defendant's care because she "couldn't get ahold of" Father. While working, she received a call from Defendant, who reported that Z.H. had fallen off the bed. At the time, Mother's bed frame was larger than her mattress, so a portion of the frame rail was left exposed. Defendant told Mother that Z.H. was fine and was playing normally. Defendant testified at trial that Z.H. had a mark on his head from the incident and cried immediately afterward but was otherwise fine. Defendant said that Z.H. was laughing and playing not long after.

Mother left work around noon that day. When she returned home, she and Z.H. went to visit Mother's aunt, who was recovering from knee surgery. Mother noticed a "small mark" on Z.H.'s head but did not believe it to be serious, especially given that Z.H. was a little boy and ran into things. Mother also noticed a scratch on Z.H.'s chest but attributed it to his falling off the bed.

Mother left for work around 4:45 p.m. on Thursday, August 18, 2016, because she was scheduled to work the closing shift. Mother left Z.H. in Defendant's care again because she could not reach Father. According to Mother, no one else was with Defendant and Z.H. Defendant called Mother during her shift and told her that "there had been a

tricycle accident." Defendant told Mother that Z.H. was riding on his tricycle and that he and Z.H. collided as Z.H. rounded a corner, causing Defendant to fall on top of Z.H. Mother described Z.H.'s tricycle at trial as a "small red toddler tricycle." At the time, Z.H. was around three feet tall and weighed about thirty pounds. Mother returned home after her shift ended at midnight. Z.H. was in bed asleep, so she kissed him good night and left his bedroom.

Mother worked the "mid-shift" on Friday, August 19, 2019, which lasted from 11:00 a.m. to 6:00 p.m. Before Mother left, Z.H. was "very fussy and clingy," more so than usual. Mother saw no reason to take Z.H. to the doctor at this point—in addition to the knot on his head and the scratch on his chest, he had a slightly swollen lip, but Mother did not believe it to be serious. She attributed Z.H.'s mood and swollen lip to being sore from the tricycle accident. Mother put Z.H. in the bath and left Defendant to bathe Z.H. Mother wanted to leave while Z.H. was in the bath so he would not cry when she left. Mother left her apartment around 10:30 that morning, leaving Z.H. in Defendant's care.

At trial, Mother described an event on November 21, 2015 when Z.H. was one year old where he jumped off the couch and Mother took him to the hospital.[2] Mother said the hospital staff told her at that time that she "was a first-time mom and [she] was overreacting and that [Z.H.] was fine."

Mother received a phone call from a friend while she was working that morning, who reported to her that Defendant and Z.H. were on their way to Parkridge West Hospital in Jasper. Mother called Defendant, who told her, "I can't wait for you to get here, I have to take him now." Mother recalled at trial that Defendant sounded "anxious." Defendant did not tell Mother what had happened to Z.H. Mother left work and drove to the hospital.

Defendant and his mother, Amanda Fitzgerald, arrived with Z.H. at the hospital at the same time as Mother. Defendant was holding Z.H., who appeared "lifeless" to Mother. Mother "grabbed" Z.H. and ran into the hospital. She did not believe Z.H. was breathing and informed the medical staff. In her rush, Mother did not closely look at Z.H.

Harold Fry, at the time a registered nurse at Parkridge West, was the first person to attend to Z.H. Defendant told Mr. Fry that Z.H. had fallen off a tricycle the day before. Mr. Fry observed Z.H. and saw bruising "all over his body," which led Mr. Fry to suspect that "th[is] was more than just a tricycle accident." As the trauma team attended to Z.H., he slipped in and out of consciousness and his breathing was "erratic." Mr. Fry noted that Z.H. had bruising and swelling all over his face, forehead, and on both sides of his eyes,

---

[2] Michelle Story, the nurse who helped treat Z.H. at that time, testified for the defense at trial and recounted this event. Z.H.'s medical records from this event were admitted as an exhibit at trial.

among other injuries. Mr. Fry noted that Mother was upset and Defendant appeared "unemotional."

After about an hour, Z.H. was transported to the Children's Hospital at Erlanger in Chattanooga because his condition continued to worsen. An airlift was unavailable because of poor weather, so Z.H. had to be transported by ambulance. Mother and Defendant rode together following the ambulance to Erlanger.

After Z.H. was transported to Erlanger, Mr. Fry contacted child protective services because he suspected that Z.H. was a victim of child abuse. Mr. Fry later told law enforcement that he did not believe Z.H.'s injuries were consistent with falling off a tricycle.

Mother told Erlanger staff on arrival that she had gotten home around midnight the previous night and Z.H. was already in bed asleep. She told the staff that on the morning of August 19, she had brought Z.H. into bed with her because he was "moaning" and that he did not eat or drink well that morning. Mother told hospital staff that she did not see bruising, but she attributed Z.H.'s being "out of it" to his tricycle accident, about which she told the staff. One of the hospital staff overheard Mother saying to someone on the phone, "if anything happens to me, I love you." Defendant told hospital staff that he had run into Z.H. while he was riding a tricycle.

Dr. Darwin Koller was the treating pediatric emergency physician for Z.H. at Erlanger. Upon Z.H.'s arrival, Dr. Koller and his team were "struck" by the extent of bruising on Z.H.'s body. Z.H. was bruised in places that Dr. Koller did not expect a two-year-old boy to be bruised, such as his ears, lip, the inside of his arms, and his belly. Z.H. also had bruising on both sides of his scrotum and bruising and an abrasion on his penis. Dr. Koller explained at trial that two-year-old boys are more commonly bruised on their shins and outer forearms from bumping into things while playing. Dr. Koller opined at trial that Z.H.'s injuries were caused by "nonaccidental trauma," which he said is the "modern term" for child abuse. Dr. Koller testified extensively at trial as to Z.H.'s injuries. Dr. Koller noted that Z.H. had suffered a "diffuse axonal injury" to his brain which, according to Dr. Koller, would have been immediately symptomatic. Several photographs of Z.H. taken while under Dr. Koller's care were admitted as exhibits at trial.[3] A CT scan of Z.H.'s head revealed that he was bleeding between his skull and his scalp, and an abdominal CT scan showed serious internal bleeding from lacerations on his liver and that blood was pooling in his belly. After having "coded" three times, Z.H. died at 3:41 p.m.

---

[3] These photographs are not contained in the record on appeal.

Dr. Koller determined that Z.H. died from hemorrhagic shock, cardiopulmonary arrest, and "nonaccidental trauma," i.e., child abuse. A postmortem x-ray of Z.H. revealed an older, healing fracture in his left leg. Z.H.'s medical records from Erlanger were admitted as an exhibit at trial.

According to Father, when Dr. Koller told Z.H.'s family that he had died, Defendant told Father, "Man, I'm sorry. I didn't mean it to go that far." Father threatened to kill Defendant. Police had to remove Father from the room.

Mother had not seen Z.H. after arriving at Erlanger until after he had passed away. When she saw Z.H., he "had bruises all over him and he seemed kind of purple. . . . His head looked swollen." This surprised Mother, who testified at trial that Z.H. "didn't really get whoopings [because] he was a good toddler." Mother also testified at trial that she did not inflict Z.H.'s injuries and she did not see them when she placed Z.H. in the bath that morning.

*Law Enforcement Investigation*

The proof at trial established that around 3:30 p.m. on August 19, 2016, Tennessee Bureau of Investigation ("TBI") Agent Mark Wilson traveled with other law enforcement personnel to Mother's apartment. They secured the scene and searched the apartment, collecting evidence they believed might be relevant. A sheet found on the floor near the bathroom with bloodstains on it was collected and sent to the TBI for DNA testing, which revealed that the blood on the sheets belonged to Z.H. Z.H.'s blood was also found on the spout of a sippy cup in the kitchen.

TBI Agents Brittany Burke and Josh Melton interviewed Mother before she left Erlanger. Mother waived her *Miranda* rights and told the agents what had happened. Mother told Agent Burke that Z.H. "didn't really want to move his arm" the morning of his death. Agent Burke noticed the healing fracture in Z.H.'s left leg in his medical records but did not ask Mother about it in either interview.

The next day, August 20, 2016, Dr. Emily Dennison, a Nashville medical examiner, performed an autopsy on Z.H. Z.H.'s head, eyes, and scalp were very swollen. He had bruising all over his head and neck and hemorrhaging in his eyelids, as well as lacerations and bruising in his mouth. Dr. Dennison observed that Z.H. had hemorrhaging under his scalp around nearly his entire head, and blood had pooled around his eyes. The right side of Z.H.'s face was "one big bruise" and the left side was similar. Z.H.'s submental space, which is the space under the chin, was also heavily bruised. Dr. Dennison testified at trial that "it is unusual to get accidental trauma to this area." Additionally, Dr. Dennison did not believe that Z.H.'s head injuries were caused by a fall from a tricycle.

- 5 -

Z.H.'s brain was swollen but did not bleed. Dr. Dennison opined that blows to Z.H.'s head such that would cause the bruising he had would have resulted in his brain swelling. This brain injury would have been "immediately symptomatic" for Z.H. Dr. Dennison testified that Z.H. would have been lethargic, "in and out of consciousness," and possibly had seizures. Z.H.'s brain injuries were "acute," or recent.

Z.H.'s torso had significant pattern bruising, though Dr. Dennison could not determine what was used to cause it. Dr. Dennison observed bruising and a laceration on Z.H.'s penis as well as internal bruising of his spermatic cord, all of which she attributed to blunt force trauma.

Dr. Dennison observed petechial hemorrhages of Z.H.'s thymus (an organ surrounding a child's heart), and bruising of his heart muscle, both attributable to blunt force trauma. Z.H.'s lungs were bruised, which Dr. Dennison testified would not have been caused by his intubation at Parkridge West; rather, blunt force trauma caused those injuries. Z.H.'s lung cavities had significant amounts of blood in them. Z.H.'s esophagus was bruised, as was his diaphragm, which is "difficult to injure." Additionally, some of Z.H.'s ribs were fractured on the back side, which is associated with nonaccidental trauma. Dr. Dennison explained at trial that babies' and children's bones are "a lot more elastic and bendable" than adult bones, so much more force is required to break children's bones.

Z.H.'s mesentery, the area surrounding his intestines, was heavily bruised and had bled internally. Z.H. suffered significant bruising in his retroperitoneal space, the area surrounding his kidneys, and his kidney function was significantly impaired before he died. His liver was lacerated in multiple places, one of which was "very deep." Dr. Dennison could not collect and measure all of the blood from Z.H.'s internal bleeding, but she collected 400 milliliters of blood from his belly and his chest cavity, which constituted around 35% of a two-year-old's total blood volume. Z.H.'s left humerus had recently been fractured near his elbow, which Dr. Dennison stated is generally seen "with kids who are pulled or grabbed around the arm."

Dr. Dennison did not believe that any of Z.H.'s injuries were caused by resuscitation attempts. Rather, she attributed nearly every injury Z.H. suffered to blunt force trauma. She estimated that all of Z.H.'s injuries occurred within a two-day window before his death.

Dr. Dennison observed a few things that were not caused by blunt force trauma and that had not occurred in the few days leading to his death. For example, Z.H. had an "air pocket" in one of his lungs, which Dr. Dennison stated he could have been born with. Z.H. also had "pleural adhesions," which is when "the lungs are stuck to the chest wall." Dr.

Dennison explained that this could be caused in several ways, such as a past illness or a surgery.

Dr. Dennison ultimately concluded that Z.H.'s cause of death was blunt force trauma and his manner of death was homicide. Aside from his extensive injuries, Z.H. was a normal, healthy, well-developed two-year-old. Dr. Dennison's autopsy report of Z.H. was admitted as an exhibit at trial, as were several photographs of Z.H. taken during the autopsy.[4]

*Defense Proof*

Defendant testified on his own behalf at trial, relaying a different version of events from Mother and the State's other witnesses.

Defendant testified that the morning of Thursday, August 18, 2016, Z.H. got into some "coconut hair oil" and covered himself in it. Defendant said that Z.H. had eaten some of the hair oil and "there was mess all over him." According to Defendant, Mother was "pretty upset" about the situation. Defendant claimed that Mother began yelling at Z.H., which led to an argument between Defendant and Mother because Defendant told her "she should not be yelling like that." Z.H. began to cry during the argument, and Defendant claimed that Mother struck Z.H. "open handedly" on the side of his face. Z.H. would not stop crying, so Mother continued to hit him. Defendant stated he left the apartment and went to Ms. Fitzgerald's house. Defendant said he saw Mother hit Z.H. three or four times. Defendant conceded on cross-examination that his testimony at trial was the first time he had ever mentioned anything about Z.H. getting into the hair oil. Defendant also acknowledged that he was physically superior to Mother and could have prevented her from beating Z.H. or called the police. He did not seek medical attention for Z.H. after Mother allegedly beat him.

Defendant stayed with Ms. Fitzgerald for 30 or 45 minutes and then returned to Mother's apartment. He testified he began to pack his things and told Mother that he was leaving her. A photograph taken by TBI agents during their search of Mother's apartment and admitted as an exhibit at trial showed a stack of folded clothes, which Defendant claimed were his. Defendant did not leave Mother that day. He alleged that he was afraid that Mother would claim that he beat Z.H.

Defendant claimed that he saw Z.H. later on August 18, and that he had other bruising on his head besides what occurred when he fell off the bed the previous day. Defendant confirmed that Mother left for work that afternoon and that he watched Z.H.

---

[4] These photographs are not in the record on appeal.

Defendant described Z.H.'s behavior as "tired" and "drowsy." Defendant said that Z.H. did not want to eat. Z.H. "drank plenty, but he stayed in his bedroom most of the day." Defendant confirmed that Mother returned home around midnight.

Defendant testified he next saw Z.H. the following morning, on August 19. Defendant stated that Mother went into Z.H.'s room because he was crying, and Z.H. screamed when Mother tried to pick him up. According to Defendant, Mother brought Z.H. back to her bedroom and said, "'He seems like he's hurting, and he's favoring his arm.'" Defendant said they decided to put Z.H. in the bath to make him feel better. He did not notice that Z.H. had any trouble moving his body, "other than his arm that he favored." Defendant testified that he saw more bruising on Z.H.'s chest and arm, on his head, on his back, and on his face. Defendant told Mother that she needed to take Z.H. to the doctor for his arm, but Mother refused because she did not want anyone to find out, especially Father. Defendant conceded on cross-examination that he initially told TBI agents that he and Mother both decided that Z.H. did not need medical attention at that time.

Defendant finished bathing Z.H. while Mother left for work. Defendant fixed some pizza rolls for Z.H. to eat and brought him a drink in a sippy cup. Defendant said that Z.H. was sitting at the end of the bed "and he just started having a seizure." Z.H. fell off the bed onto his face and Defendant rushed to pick him up. Z.H. cried for a few seconds and "then his eyes started to roll back." Defendant ran with Z.H. out of the apartment to Ms. Fitzgerald's house. Ms. Fitzgerald drove Defendant and Z.H. to Parkridge West Hospital because they decided an ambulance would not arrive quickly enough. Defendant told a friend who was nearby to call Mother. Defendant told Ms. Fitzgerald that Z.H. had fallen off of his tricycle.

Defendant said that during the drive to the hospital, which he estimated took 5 or 10 minutes, Z.H. would wake up for a few seconds, cry, and then convulse and moan. They met Mother at the hospital.

Defendant testified that he told hospital staff at Parkridge West that he had fallen on Z.H. while Z.H. was riding his tricycle. Defendant admitted that the tricycle incident was a lie. He stated that Mother "came up with the story . . . so if anybody ask[ed] questions that she would back [Defendant] up." He claimed that Mother made up the tricycle story after he returned from Ms. Fitzgerald's apartment to pack his belongings. Defendant said, "I didn't think he was going to die, so I didn't mind going along with that lie." However, Defendant admitted on cross-examination that he had not spoken to Mother before he told Ms. Fitzgerald and the Parkridge West staff about the alleged tricycle accident. According to Defendant, Mother was worried about how Father would react if he knew that Z.H. had been injured. Defendant alleged that Mother did not want Father to watch Z.H. on Thursday or Friday because she did not want Father to see Z.H. and ask questions.

Defendant also relayed the tricycle lie to Erlanger staff before Z.H. died and to TBI agents after he died. Defendant claimed at trial that he lied to the TBI agents "because he was already invested in the lie" and did not want to be blamed for Z.H.'s death if he changed his story. Defendant and Mother ended their romantic relationship around a month after Z.H. died.

Defendant testified that he did not cause any of Z.H.'s injuries that led to his death. Defendant claimed that Mother was responsible for Z.H.'s injuries.

On cross-examination, Defendant conceded that he did not see Mother kick Z.H. in the groin. Defendant admitted that despite being interviewed twice by TBI agents before he was charged (the second occurring well after Defendant and Mother ended their relationship), Defendant maintained the lie about the tricycle accident and did not say that Mother had caused Z.H.'s injuries. Defendant insisted that Mother had caused Z.H.'s injuries.

Defendant presented Father as a witness at trial. Father testified that he believed that Defendant and Mother were both responsible for Z.H.'s death. Z.H. had been with Father "[p]retty well the whole 30 days" prior to his death, save the five days immediately preceding his death, which Z.H. spent with Mother. Father testified at trial that he had kept Z.H. from Mother because he had an argument with Defendant.

According to Father, Mother sent him a text message the weekend before Z.H.'s death stating that she and Defendant were no longer in a romantic relationship. Father allowed Mother to watch Z.H. because she had told him this. However, Mother later sent Father a video of Z.H. playing, and Father heard Defendant's voice in the background. Father confronted Mother about this, and Mother told Father to "mind [his] f[***]ing business."

Father's cell phone was broken and he had car problems the day before Z.H.'s death, so he used other people's phones to contact Mother and asked her to bring Z.H. to him, but Mother refused. Mother told Father that Z.H. would be staying with her aunt and cousins. Mother also told Father that she tried to bring Z.H. to him but could not contact him.

Father described an incident at trial in which Z.H. collided with him while riding his tricycle and the two fell down the stairs. Father told Mother about the incident. Z.H. was not hurt.

Dr. John Hunsaker testified for the defense as an expert in forensic pathology. Dr. Hunsaker examined statements from Mother, Father, and Defendant, as well as Z.H.'s

medical records, Dr. Dennison's autopsy report, and photographs from the hospital and from the autopsy. Dr. Hunsaker agreed with Dr. Dennison that Z.H.'s death was caused by blunt force injuries, but disagreed that the manner of Z.H.'s death was homicide. Dr. Hunsaker did not believe that the injuries to Z.H.'s head led to his death. Dr. Hunsaker disagreed with Dr. Dennison's conclusion that Z.H.'s injuries were caused within the last 48 hours of his life because she did not microscopically examine the lacerated area of Z.H.'s liver. According to Dr. Hunsaker, there was no way to accurately estimate when Z.H.'s injuries occurred because Dr. Dennison did not perform certain microscopic tests on Z.H.'s brain, though he believed that Z.H.'s brain injuries did not occur on the day of his death.

Dr. Hunsaker conceded on cross-examination that he was unaware that Defendant had stated that Z.H. fell off the bed and hit his head on a bed rail. Dr. Hunsaker was likewise unaware that the tricycle accident had not happened. He conceded that Z.H.'s injuries were "probably not" consistent with falling off a tricycle. Ultimately, Dr. Hunsaker maintained that there was not enough information to conclude that Z.H.'s injuries were caused by another person.

*Verdict, Sentencing, and Appeal*

The jury convicted Defendant of the lesser-included offense of reckless homicide and aggravated child abuse as charged in the indictment.

After considering the proof offered at the sentencing hearing and the relevant statutory factors, the trial court sentenced Defendant to 22 years for aggravated child abuse and 3 years and 6 months for reckless homicide. The trial court aligned the sentences concurrently, resulting in a total effective sentence of 22 years' incarceration.

Defendant appealed, and this Court waived the timely filing requirement for Defendant's notice of appeal.

***Analysis***

Defendant argues on appeal that: (1) the juvenile court erred in transferring his case to circuit court; (2) the State violated its *Brady* obligations by failing to provide defense counsel with a copy of Defendant's statements prior to the juvenile transfer hearing; (3) the evidence was insufficient to support his convictions; (4) his conviction for aggravated child abuse should be barred under the doctrine of "mutually exclusive verdicts"; and (5) his sentence is excessive.[5] We address each issue in turn.

_____

[5] We have reordered Defendant's issues for clarity.

- 10 -

*Juvenile Transfer Hearing*

Defendant contends that the juvenile court erred in transferring his case to circuit court. The State argues that the juvenile court properly transferred jurisdiction because the evidence established probable cause to believe that Defendant committed the charged offenses. We agree with the State.

A juvenile court may transfer a juvenile to circuit court if the juvenile court finds that there is probable cause to believe that the juvenile committed the alleged acts, is not mentally impaired, and should be legally restrained. T.C.A. § 37-1-134(a)(4); *see also State v. Brown*, No. W2012-01297-CCA-R3-CD, 2013 WL 4029216, at *6 (Tenn. Crim. App. Aug. 7, 2013), *perm. app. denied* (Tenn. Dec. 12, 2013). The terms "probable cause" and "reasonable grounds" are interchangeable in juvenile transfer analysis. *See State v. Reed*, No. M2009-00887-CCA-R3-CD, 2010 WL 3432663, at *10 (Tenn. Crim. App. Aug. 31, 2010), *perm. app. denied* (Tenn. Jan. 13, 2011). We review the juvenile court's findings regarding the criteria in subsection (a)(4) for abuse of discretion. *See State v. Adkisson*, No. W2022-01009-CCA-R3-CD, 2024 WL 1252173, at *5 (Tenn. Crim. App. Mar. 25, 2024) (citation omitted), *no perm. app. filed*. In making its probable cause determination under Tennessee Code Annotated section 37-1-134(a), the juvenile court must consider:

(1) The extent and nature of the child's prior delinquency records;
(2) The nature of past treatment efforts and the nature of the child's response thereto;
(3) Whether the offense was against person or property, with greater weight in favor of transfer given to offenses against the person;
(4) Whether the offense was committed in an aggressive and premeditated manner;
(5) The possible rehabilitation of the child by use of procedures, services and facilities currently available to the court in this state; and
(6) Whether the child's conduct would be a criminal gang offense . . . if committed by an adult.

T.C.A. § 37-1-134(b) (2018).[6] Additionally, the juvenile court's findings of fact "'are given the weight of a jury verdict and are conclusive unless we find that the evidence preponderates against these findings.'" *Adkisson*, 2024 WL 1252173, at *6 (quoting *State v. Swatzell*, No. 01-C01-9005-CC-00126, 1992 WL 25008, at *1 (Tenn. Crim. App. Feb. 14, 1992), *perm. app. denied* (Tenn. May 4, 1992)).

---

[6] This statute has since been amended to include an additional factor not relevant here.

The juvenile court heard testimony at the transfer hearing from Agent Burke and Dr. Dennison. Dr. Dennison's testimony mirrored her trial testimony, so we need not repeat it here.

Agent Burke testified at the hearing that she spoke with Defendant at Erlanger the night Z.H. died. She recorded the interview, but a recording was not available for the transfer hearing. The State gave defense counsel a written summary of the interview before the hearing.

In the first interview, Defendant told Agent Burke that he had babysat Z.H. for the previous two days while Mother was at work. Defendant said that on Wednesday, August 17, Z.H. fell off the bed. Z.H. hit his head on the bed frame, which was wider than the mattress. Defendant told Agent Burke that Z.H. had a knot on his head, a bruise, and had a cut on his lip.

Defendant told Agent Burke that he fell on Z.H. while Z.H. was riding his tricycle on Thursday, August 18. According to Defendant, Z.H. landed on the floor, the tricycle landed on Z.H., and Defendant landed on the tricycle. Defendant told Agent Burke that Andrew Ford was in the apartment when the alleged tricycle accident happened.

Defendant said that the next morning, Friday, August 19, Z.H. "was acting kind of sore" and did not want to move one of his arms. Defendant told Agent Burke that Mother put Z.H. in the bath and left for work. Defendant claimed that he fed Z.H. some pizza rolls after his bath, at which point Z.H. began seizing and fell off the bed. Defendant grabbed Z.H., ran to Ms. Fitzgerald, and they left for the hospital.

Defendant did not allege that Mother beat Z.H. Rather, Defendant told Agent Burke that Mother "babied" Z.H. and that Z.H. would cry if he fell because he knew Mother would pick him up and baby him.

Agent Burke interviewed Defendant for a second time in December 2017. His second interview was largely consistent with his first, save the added detail that Defendant and Mr. Ford took Z.H. to Wal-Mart after the tricycle accident. Agent Burke could not verify that they went to Wal-Mart.

Agent Burke also interviewed Mother at Erlanger. Mother's version of events was consistent with her trial testimony. Mother did not suspect at the time that Defendant had killed Z.H., but she told Agent Burke after the autopsy report was released that it did not make sense in light of what Defendant had told her.

After hearing from Agent Burke and Dr. Dennison, the juvenile court found that reasonable grounds existed to believe that Defendant committed the acts as alleged. The juvenile court noted that it heard no testimony to establish that Defendant was mentally impaired and that the interest of the community required legal restraint or discipline. The juvenile court found Defendant's prior juvenile record a non-issue, having heard nothing about it. The juvenile court found that the offenses at issue here were committed against a person, which weighed in favor of transfer, and that they were committed in a premeditated and aggressive manner, which the juvenile court gave great weight. The juvenile court found factor (6) inapplicable because no evidence showed that these offenses were committed in connection with gang activity. Additionally, the court noted that Defendant was "outside the window of anything [the juvenile court] could offer" because he was twenty years old at the time of the juvenile transfer hearing.

Defendant does not argue that he was mentally impaired, nor does he argue that the evidence did not establish probable cause to believe he should be legally restrained. Rather, Defendant argues that the evidence did not establish probable cause to believe that he committed the charged offenses.

Defendant was charged in juvenile court with first-degree felony murder and aggravated child abuse. First degree felony murder in this context is "[a] killing of another committed in the perpetration of . . . aggravated child abuse[.]" T.C.A. § 39-13-202(a)(2). "A person commits the offense of aggravated child abuse . . . , who [knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury] . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child[.]" T.C.A. §§ 39-15-402(A)(1); 39-15-401(a). There was no question that Z.H. had died, that Z.H. was under 18 years old, and that his injuries were serious. The transfer hearing's focus was on whether there was probable cause to believe that Defendant was responsible for Z.H.'s injuries.

The record here establishes that the juvenile court thoroughly made the requisite findings. The juvenile court heard testimony that Defendant babysat Z.H. in the two days leading up to his death and on the morning of his death. Defendant's explanation of the events as established in his interview with Agent Burke was that Z.H.'s injuries were the result of his accidentally falling off the bed on Wednesday and his tricycle accident on Thursday. Mother told Agent Burke that the autopsy results did not make sense in light of Defendant's version of events and that she had seen only minor injuries on Z.H. the morning of his death. Dr. Dennison testified that Z.H.'s death was caused by blunt force injuries and that his manner of death was homicide. Dr. Dennison further testified that Z.H.'s injuries were inconsistent with the accidents that Defendant alleged, his injuries were not consistent with those from medical intervention, and that his injuries were typically seen in children who were beaten or shaken. Defendant was alone with Z.H. on

the morning of his death. This proof supports the conclusion that probable cause existed that Defendant committed the offenses of first degree felony murder and aggravated child abuse. The juvenile court did not abuse its discretion in concluding that Defendant's case was appropriate for transfer to circuit court. Defendant is not entitled to relief on this issue.

Brady *Violation*

Defendant complains that the State violated its disclosure obligations under *Brady v. Maryland*, 373 U.S. 83 (1963), by failing to provide defense counsel with copies of Defendant's statements before the juvenile transfer hearing. The State argues that Defendant has waived this issue by failing to provide an adequate record for our review, and alternatively, the juvenile court properly concluded that the State did not withhold material exculpatory evidence from Defendant. We agree with the State that this issue is waived.

"[T]he suppression of evidence favorable to an accused upon request violates due process where the evidence is material either to guilt or to punishment, irrespective of the good faith or bad faith of the prosecution." *Brady*, 373 U.S. at 87. To establish a *Brady* violation, a defendant must show that: "(1) the defendant requested the information . . . ; (2) the State suppressed evidence in its possession; (3) the suppressed evidence was favorable to the defendant; and (4) the evidence was material." *State v. Jackson*, 444 S.W.3d 554, 594 (Tenn. 2014). Favorable evidence is material where "'there is a probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Id.* at 595 (quoting *State v. Edgin*, 902 S.W.2d 387, 390 (Tenn. 1995)). A defendant must prove a constitutional violation by a preponderance of the evidence. *Edgin*, 902 S.W.2d at 389. Additionally, *Brady*'s disclosure obligations apply at juvenile transfer hearings, which are dispositional rather than adjudicatory. *See State v. Booker*, No. E2018-01439-CCA-R3-CD, 2020 WL 1697367, at *22 (Tenn. Crim. App. Apr. 8, 2020), *rev'd on other grounds*, 656 S.W.3d 49 (Tenn. 2022); *see also* Tenn. R. Juv. Prac. & Proc. 206, Advisory Comm'n Cmt.

As an initial matter, we must address the State's waiver argument. Defendant did not avail himself of the opportunity to address this argument in his reply brief. The State notes that Defendant did not provide us with the recording or the summary of his first interview with Agent Burke or the transcript of his second interview. Therefore, the State argues, we cannot determine whether the statements were exculpatory or material. We agree.

The appellant bears the burden of preparing an adequate record for the resolution of the issues. *See State v. Rimmer*, 623 S.W.3d 235, 296 (Tenn. 2021) (citing *State v. Ballard*, 855 S.W.2d 557, 560 (Tenn. 1993)) (appendix); *see also* Tenn. R. App. P. 24(a). "In the

- 14 -

absence of an adequate record, this [C]ourt must presume that the trial court's ruling was correct." *Rimmer*, 623 S.W.3d at 296 (citing *State v. Richardson*, 875 S.W.2d 671, 674 (Tenn. Crim. App. 1993) and *State v. Ivy*, 868 S.W.2d 724, 728 (Tenn. Crim. App. 1993)) (appendix).  Because Defendant did not provide us with the evidence that the State allegedly withheld, we cannot determine whether it was exculpatory or material.  This issue is waived for our consideration, and Defendant is not entitled to relief on this issue.

*Sufficiency of the Evidence*

Defendant argues that the evidence was insufficient to support either of his convictions.  The State argues that the evidence was sufficient with respect to both.  We agree with the State.

When examining whether the evidence presented at trial was sufficient to support a conviction, several well-settled principles guide our analysis.  We determine "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979) (emphasis in original); *see also* Tenn. R. App. P. 13(e).  A guilty verdict removes the presumption of innocence and replaces it with a presumption of guilt.  *State v. Evans*, 838 S.W.2d 185, 191 (Tenn. 1992).  The defendant bears the burden on appeal to demonstrate that the evidence is insufficient to support his conviction.  *State v. Tuggle*, 639 S.W.2d 913, 914 (Tenn. 1982).

"[A] jury verdict, approved by the trial judge, accredits the testimony of the witnesses for the State and resolves all conflicts in favor of the theory of the State." *State v. Harris*, 839 S.W.2d 54, 75 (Tenn. 1992).  The State is entitled on appeal to "the strongest legitimate view of the evidence and to all reasonable and legitimate inferences that may be drawn therefrom." *State v. Elkins*, 102 S.W.3d 578, 581 (Tenn. 2003).  As such, this Court is precluded from re-weighing or reconsidering the evidence when evaluating the convicting proof.  *State v. Morgan*, 929 S.W.2d 380, 383 (Tenn. Crim. App. 1996); *State v. Matthews*, 805 S.W.2d 776, 779 (Tenn. Crim. App. 1990).  Moreover, we may not substitute our own "inferences for those drawn by the trier of fact from circumstantial evidence." *Matthews*, 805 S.W.2d at 779.  Questions as to the credibility of witnesses and the weight of the evidence, as well as factual issues raised by such evidence, are resolved by the trier of fact, not this Court.  *State v. Pruett*, 788 S.W.2d 559, 561 (Tenn. 1990).  These principles guide us "'whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn. 2009)).

Aggravated Child Abuse

As stated above, "[a] person commits the offense of aggravated child abuse . . . , who [knowingly, other than by accidental means, treats a child under eighteen (18) years of age in such a manner as to inflict injury] . . . and . . . [t]he act of abuse . . . results in serious bodily injury to the child[.]" T.C.A. §§ 39-15-402(A)(1); 39-15-401(a).

The proof at trial, viewed in the light most favorable to the State, established that Defendant babysat Z.H., a normal and well-developed two-year-old, by himself while Mother was at work in the two days leading up to Z.H.'s death and on the morning of his death. Mother never saw any serious injuries on Z.H., including when she left for work the morning of his death. Defendant rushed Z.H. to the hospital on Friday, August 19, 2016, because Z.H. was seizing. Drs. Koller and Dennison testified to the extent of Z.H.'s injuries. Z.H. was covered in bruises, had a laceration on his liver that led to serious internal bleeding, had a recent diffuse axonal brain injury that would have been immediately symptomatic, and had bruising on his scrotum and a laceration on his penis, among other injuries. Dr. Koller concluded that Z.H.'s injuries were the result of "nonaccidental trauma," i.e., child abuse, because they were inconsistent with the types of accidental injuries that two-year-old boys typically sustain. Dr. Dennison observed bruising and lacerations to Z.H.'s internal organs as well as pooled blood from where Z.H. had bled internally. Dr. Dennison testified that Z.H.'s injuries would not have been caused by resuscitation attempts, and both doctors rejected the notion that Z.H.'s injuries were caused by a fall from the bed or a tricycle collision with Defendant. Dr. Dennison concluded that nearly all of Z.H.'s injuries were attributed to blunt force trauma occurring in a two-day window before his death.

To be sure, Defendant offered his version of events, and the jury simply rejected it, as was its prerogative. This evidence was sufficient for a rational juror to conclude that Defendant committed aggravated child abuse against Z.H., and Defendant is not entitled to relief on this issue.

Reckless Homicide

"Reckless homicide is a reckless killing of another." T.C.A. § 39-13-215(a). "A person acts recklessly with respect to . . . the result of the conduct when the person is aware of, but consciously disregards a substantial and unjustifiable risk that . . . the result will occur." *Id.* § 39-11-106(34). "The risk must be of such a nature and degree that its disregard constitutes a gross deviation from the standard of care that an ordinary person would exercise under all the circumstances as viewed from the accused person's standpoint." *Id.* "When recklessness suffices to establish an element, that element is also established if a person acts intentionally or knowingly." T.C.A. § 39-11-301(a)(2). So, the mens rea of recklessness is encompassed by the definition of "knowing." *State v.*

*Brown*, 311 S.W.3d 422, 433-34 (Tenn. 2010) (citing *State v. Ely*, 48 S.W.3d 710, 723 (Tenn. 2001)).

As discussed above, the evidence established that Defendant acted knowingly with respect to the abuse. We believe that a rational juror could conclude beyond a reasonable doubt that Defendant consciously disregarded a substantial and unjustifiable risk that severely beating Z.H. would result in his death. *Cf. Brown*, 311 S.W.3d at 435 (holding that failure to instruct jury on reckless homicide as lesser included offense of felony murder committed in the perpetration of aggravated child abuse was not harmless error because the jury could have concluded that the defendant was aware of, but consciously disregarded a substantial and unjustifiable risk that the victim's death would occur). The evidence presented at trial was therefore sufficient to support Defendant's conviction for reckless homicide. Defendant is not entitled to relief on this issue.

*"Mutually Exclusive Verdicts"*

Defendant argues that we should vacate his conviction for aggravated child abuse because the jury's verdicts were mutually exclusive. The jury found that Defendant acted recklessly, argues Defendant, which therefore precludes a finding that he acted knowingly. The State argues that this is not a basis for relief, and in any event, the jury's verdicts were not mutually exclusive. We agree with the State that this issue is not a basis for relief.

Mutually exclusive verdicts exist when "'a guilty verdict on one count logically excludes a finding of guilty on the other.'" *State v. Snipes*, No. W2011-02161-CCA-R3-CD, 2013 WL 1557367, at *8 (Tenn. Crim. App. Apr. 12, 2013) (quoting *State v. Jones*, No. W2009-01698-CCA-R3-CD, 2011 WL 856375, at *10 (Tenn. Crim. App. Mar. 9, 2011), *perm. app. denied* (Tenn. Aug. 25, 2011)), *perm. app. denied* (Tenn. Sept. 13, 2013). Our supreme court specifically rejected this doctrine in *State v. Davis*, 466 S.W.3d 49, 77 (Tenn. 2015) and maintained that even inconsistent verdicts are not a basis for relief in Tennessee.

We, of course, are in no position to overrule our supreme court. *See State v. Lackey*, No. M2015-01508-CCA-R3-CD, 2016 WL 4055709, at *8 (Tenn. Crim. App. July 27, 2016), *perm. app. denied* (Tenn. Oct. 20, 2016). Defendant is not entitled to relief on this issue.

*Sentencing*

Defendant complains that his sentence is excessive because he was only seventeen years old when he committed his crimes. However, Defendant does not challenge the trial

court's reliance on enhancement factors. The State counters that the trial court properly exercised its discretion in sentencing Defendant. We agree with the State.

"[S]entences imposed by the trial court within the appropriate statutory range are to be reviewed under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). Stated differently, this Court is "bound by a trial court's decision as to the length of the sentence imposed so long as it is imposed in a manner consistent with the purposes and principles set out" in the Sentencing Act. *State v. Carter*, 254 S.W.3d 335, 346 (Tenn. 2008). "'A trial court abuses its discretion when it applies incorrect legal standards, reaches an illogical conclusion, bases its ruling on a clearly erroneous assessment of the proof, or applies reasoning that causes an injustice to the complaining party.'" *State v. Gevedon*, 671 S.W.3d 537, 543 (Tenn. 2023) (quoting *State v. Phelps*, 329 S.W.3d 436, 443 (Tenn. 2010)). "The abuse of discretion standard of review envisions a less rigorous review of the lower court's decision and a decreased likelihood that the decision will be reversed on appeal." *State v. McCaleb*, 582 S.W.3d 179, 186 (Tenn. 2019). The party challenging a sentence bears the burden of demonstrating its impropriety. T.C.A. § 40-35-401, Sentencing Comm'n Cmts.; *see also State v. Ashby*, 823 S.W.2d 166, 169 (Tenn. 1991).

As to enhancement factors, we note that a trial court's misapplication of an enhancement or mitigating factor does not invalidate the presumption of reasonableness, so long as the trial court articulates reasons consistent with the purposes and principles of sentencing. *Bise*, 380 S.W.3d at 705-06. Additionally, "'[t]he application of a single enhancement factor can justify an enhanced sentence.'" *State v. Rollins*, No. E2022-00890-CCA-R3-CD, 2023 WL 4078700, at *5 (Tenn. Crim. App. June 20, 2023) (quoting *State v. Banks*, No. M2019-00017-CCA-R3-CD, 2020 WL 5888, at *10 (Tenn. Crim. App. Aug. 25, 2020)), *perm. app. denied* (Tenn. Oct. 13, 2023). "The weighing of mitigating and enhancement factors is left to the sound discretion of the trial court," and is not a basis for reversal. *State v. Dotson*, 450 S.W.3d 1, 103 (Tenn. 2014) (citing *State v. Carter*, 254 S.W.3d 335, 345 (Tenn. 2008)).

The trial court here explained each enhancement factor it considered in determining Defendant's sentence and the weight it accorded each factor. The trial court specifically relied on enhancement factors (1), (5), and (14) with respect to both convictions, noting that it gave factor (14) great weight. *See* T.C.A. §§ 40-35-114(1), (5), (14). The trial court also applied enhancement factor (4) to the reckless homicide conviction. *Id.* § (4). As to mitigating factors, the trial court applied mitigating factor (6) because Defendant was 17 years old when these offenses occurred. *Id.* § 40-25-113(6). The trial court therefore lowered his sentence by one year on the aggravated child abuse conviction and six months on the reckless homicide conviction. Defendant claims that his sentence is cruel and unusual, but this argument falls flat. His sentence is proportionate under the Eighth

Amendment because the trial court considered his age in fashioning its sentence. *See Booker*, 656 S.W.3d at 60 (stating that sentencing courts must "take the mitigating qualities of youth into account"). Defendant's argument boils down to a disagreement with the trial court on the weight that his age should have been given in determining his sentence. As noted above, this is not a ground for relief. *Dotson*, 450 S.W.3d at 103. Defendant is not entitled to relief on this issue.

## CONCLUSION

Based on the foregoing, we affirm the judgments of the trial court.

_____
TIMOTHY L. EASTER, JUDGE